[No. B069835. Second Dist., Div. Four. Jan. 19, 1995.]

LOS ANGELES NATIONAL BANK, Plaintiff and Respondent, v. BANK OF CANTON OF CALIFORNIA, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

White & Case, John A. Sturgeon, James R. Cairns and Matthew P. Lewis for Defendant and Appellant.

Suzuki & Ito and Ronald N. Ito for Plaintiff and Respondent.

**OPINION**

**HASTINGS, J.**—This appeal involves the construction and applicability of California Uniform Commercial Code section 4302[1] which requires a bank to give notice of dishonor or refusal to pay a check by midnight of the day following receipt of the check, otherwise known as the "midnight deadline" rule. Here, over $2 million in losses were sustained when two individuals, Tony Lam and Peter Wong, cashed twenty-eight worthless checks written on an account issued by appellant, Bank of Canton of California (BOC), over a period of three days at the Monterey Park branch office of respondent Los Angeles National Bank (LANB). The main issue presented is which bank should bear the loss.

Summary judgment was granted in favor of LANB based upon BOC's failure to meet the midnight deadline. A subsequent motion for new trial by BOC was denied. BOC appeals. We affirm the judgment.

---

[1]All further statutory references shall be to the California Uniform Commercial Code unless otherwise specified.

PROCEDURAL AND FACTUAL BACKGROUND

### 1. The check kiting scheme

Lam and Wong were principals at Golden Fields Leasing Company, Inc. (Golden Fields), and had established a checking account at BOC in Golden Fields's name. They had also established a banking relationship with LANB and were familiar with one of its tellers, Mrs. Au. During a three-day period in January 1986, Lam and Wong went to LANB and cashed three different batches of checks written on their BOC Golden Fields account.[2] Mrs. Au, who handled the transactions, did not verify whether there were sufficient funds in the Golden Fields account at BOC before giving Lam and Wong the cash, cashier's checks and credit that they requested for the 28 checks.[3]

On Monday, January 27, 1986, two days after cashing the last batch of checks for Lam and Wong, Mrs. Au spoke with two tellers at BOC, who informed her that there were, at that time, no funds in the Golden Fields account and that the checks would be returned. Mrs. Au then informed her branch manager, who unsuccessfully attempted to locate Lam and Wong and discovered their place of business had been vacated.

LANB processed the checks in the usual manner, as prescribed by the California Uniform Commercial Code, which involved depositing them at a clearing house, the Federal Reserve Bank (the Federal Reserve). The Federal Reserve made a provisional settlement to LANB's account for the checks, and presented the checks to BOC for final payment. At that point, BOC was required to pay the checks or notify LANB by midnight of the following banking day that it would not honor them. (§ 4302.) In this instance, it was alleged by LANB that BOC did not notify LANB or return any of the 28 checks to LANB until after the midnight deadline had passed. LANB filed an action against BOC to recover the face amount of the checks, and for conversion.

### 2. Procedural History

LANB filed its complaint against BOC in September 1986. Almost three years later, in April 1989, both parties filed summary judgment motions. The trial court granted BOC's motion for summary judgment and LANB appealed.

---

[2] The checks were made out to either Lam, Wong, Golden Fields, or LANB.

[3] Depending upon which evidence is credited, Mrs. Au either had $25,000 or $50,000 in check cashing limits. BOC suggests that Ms. Au or others at LANB may have been actively involved in the scheme to defraud BOC. We discuss the issue of fraud as a defense to the midnight deadline in part I.B.3. under DISCUSSION.

On appeal, the summary judgment in favor of BOC was reversed and the matter was remanded to the trial court in a published opinion filed in May 1991. (*Los Angeles Nat. Bank* v. *Bank of Canton* (1991) 229 Cal.App.3d 1267 [280 Cal.Rptr. 831], hereinafter referred to as *LANB I*.)[4] In December 1991, the trial court held a status conference to discuss the effect of the appeal. It set a hearing date of March 9, 1992, for a further motion for summary judgment and discovery was reopened. BOC propounded further discovery to LANB.

In February 1992, LANB filed a motion for summary judgment setting it for hearing on the reserved March date. BOC filed motions to compel discovery and requested a continuance of the scheduled motion for summary judgment. BOC also simultaneously filed a motion for leave to file a cross-complaint and an amended answer adding new affirmative defenses.

The trial court denied BOC's motions and granted summary judgment in favor of LANB. This appeal followed.

### 3. *The checks*

For ease of discussion, we shall refer to the checks in three groups, A, B, and C, based upon the days they were cashed at LANB.[5]

*Group A.*

Group A consisted of three checks totaling $900,000. Those checks were cashed at LANB on Thursday, January 23, 1986. On Friday, January 24, 1986, they were delivered to and processed by the Federal Reserve, and made available for pickup by BOC by at least 2 p.m. that day. BOC used Decimus Corporation to process the checks. Procedurally, the Federal Reserve notified BOC or Decimus that the checks were available. Decimus would then arrange for pickup, process them and forward them to BOC. The time period to calculate the midnight deadline began running when the checks were made available to Decimus. (*LANB I, supra*, 229 Cal.App.3d at p. 1280.) Check group A was not returned by BOC to LANB until Tuesday, January 28, 1986.

*Group B.*

Group B consisted of 17 checks totalling $1,091,520. The checks were cashed at LANB on Friday, January 24, 1986. They were delivered to and

---

[4]For a more detailed review of the background facts, see *LANB I*.

[5]The facts in this section are those established by LANB, and not disputed by BOC in the motion for summary judgment at issue in this appeal. See section I.A. in the DISCUSSION, *infra*.

processed by the Federal Reserve on Monday, January 27, 1986, and made available for pickup by 2 p.m. that day. Check group B was not returned by BOC to LANB until Wednesday January 29, 1986.

*Group C.*

Group C consisted of eight checks totalling $266,445. The checks were cashed at LANB on Saturday, January 25, 1986. The checks were delivered to and processed by the Federal Reserve on Tuesday, January 28, 1986, and were made available for pickup by 2 p.m. that day. Check group C was not returned by BOC to LANB until Thursday, January 30, 1986.

## 4. *The summary judgment motion*

LANB's summary judgment motion was based on the following factual scenario and argument: (1) that the midnight deadline was calculated from the time that the checks were made available for pickup by the Federal Reserve; (2) that BOC had contracted to have its checks processed by Decimus Corporation; (3) that Decimus Corporation had contracted its messenger services to U.S. Courier Corporation and had directed its schedule; (4) that U.S. Courier had followed normal procedure, as directed by Decimus, on the days in question in picking checks up from the Federal Reserve and delivering them to Decimus for processing; (5) that Decimus had followed normal procedure, as directed by BOC; (6) *that the Federal Reserve made BOC's checks available for pickup at approximately noon each day*; (7) that U.S. Courier had picked up the BOC checks each day from the Federal Reserve at approximately 5 p.m.; (8) that the BOC checks arrived at Decimus at approximately 7 p.m. the same day they were picked up; (9) that Decimus would then hold that day's delivery of checks overnight and process them the next morning; (10) that BOC would receive the checks that same morning and would return any items in dispute; and (11) since BOC did not return those checks until two banking days after they had been made available by the Federal Reserve, BOC did not comply with the midnight deadline for returning any of the checks.

LANB supported this scenario with deposition testimony from BOC, the Federal Reserve, U.S. Courier and LANB employees, some of whom had personally researched each of the checks in question.

BOC's opposition to the summary judgment motion was based primarily on the following argument: (1) that the midnight deadline does not begin to run when the Federal Reserve makes the checks available for pickup, but,

instead, when the payor bank, that is, BOC, actually receives the checks or receives notice that the checks are ready for pickup; (2) that pursuant to section 4108, a "banking day" ends at 2 p.m.; (3) that BOC (through U.S. Courier) did not receive the checks until after 2 p.m.; and (4) that therefore, there was a disputed issue of fact as to whether the midnight deadline had passed when it returned the checks to the Federal Reserve. It also argued that the "notice of dishonor" required to be given by the midnight deadline was given on January 27, 1986, when BOC's personnel orally notified Mrs. Au that there were no funds in the Golden Fields account to pay the checks she had cashed. In addition, BOC argued that LANB's conduct in cashing the checks in violation of banking regulations and without first verifying whether funds were available barred it from asserting the midnight deadline rule violation. It also attacked the midnight deadline rule on the ground that it was unconstitutional.[6]

## 5. *The trial court's rulings*

The trial court denied BOC's motion to continue the summary judgment hearing and granted LANB's motion for summary judgment. The clerk's minute order indicated that the trial court based its ruling on its reading of our decision in *LANB I*, which "comes out very squarely for a literal sort of 'strict liability' reading of the California Uniform Commercial Code section 4302 and takes the issue of causation . . . off the table."[7]

The court then placed the motion to amend the pleadings and the motion to compel discovery off calendar.

### CONTENTIONS ON APPEAL

On appeal, BOC contends that the trial court erred in denying its motions to continue and amend its pleadings. It also contends that the court erred in granting summary judgment in favor of LANB because there was a triable issue of material fact as to whether the midnight deadline was met, and that the court erroneously interpreted section 4302 as requiring written notice of dishonor. Finally, it contends that the trial court erred in allowing LANB prejudgment interest at the rate of 10 percent instead of the 7 percent rate required for noncontractual liability.

---

[6]BOC does not raise the constitutionality argument on appeal.

[7]It appears that oral argument was heard, but only a partial transcript of the proceedings was included in the record.

## DISCUSSION

I. *The trial court did not err in granting the motion for summary judgment.*

A. *No triable issue of fact was raised as to the midnight deadline.*

BOC contends that the declarations and other evidence submitted in opposition to LANB's summary judgment motion raised triable issues of material fact and therefore summary judgment should not have been granted. Its principal claim is that there was no proof that the checks were made available to be picked up before 2 p.m. from the Federal Reserve on each of the days in question and, therefore, the return of the checks was timely.

LANB's proof of when the checks were available for pickup by BOC was based primarily on the declaration of John Kimball, the associate general counsel for the Federal Reserve who had participated in drafting the Federal Reserve's rules and regulations. Kimball relied principally on a Federal Reserve operating manual entitled "Collection of Cash Items Circular 1" (hereafter Circular 1) which indicated, inter alia, that "[a] paying bank [BOC] may also pick up cash items at [the Federal Reserve] by arrangement with us. The person to whom delivery is made as requested or who picks up the items is considered to be the paying bank's agent. Delivery and presentment of the items occur at the time the items are delivered to the off-premise location *or are made available for pickup as arranged.*" (Italics added.)

According to Kimball, these provisions of Circular 1 provided that if a payor bank had made arrangements for the items to be picked up from the Federal Reserve by a messenger service and brought to an independent check processing service, the midnight deadline would begin to run from the time the checks were made available for pickup from the Federal Reserve and not when they were actually picked up by the messenger. He explained in deposition testimony, "The purpose of this language was to have presentment and delivery occur when the checks were made available for pickup regardless of whether they were picked up at that time. Or, for that matter, regardless of whether they were picked up that day. Because that was not within the control of the Reserve bank. [¶] . . . [¶] Whether the agent actually processed the checks right away or later was not within the control of the Reserve Bank, and therefore the burden, or the responsibility for prompt processing any return was put on the paying bank."

According to Kimball, absent a special agreement, checks would ordinarily be made available by the Federal Reserve by 2 p.m., the close of the banking day.

Another Federal Reserve employee, Bradley Snodgrass, the officer in charge of payment services, testified in a deposition that the Federal Reserve does not keep a log of pickups by each bank's courier but does record on a form how many boxes are sent to each bank. Often, but not always, the form will indicate what time the pickup was made. Snodgrass testified that he personally reviewed the 28 checks in question. The three checks in group A had endorsement stamps indicating that they were presented to the Federal Reserve by LANB on January 23, 1986, and were subsequently presented to the BOC on January 24, 1986. Snodgrass indicated that if the checks had not been made available to the BOC by 2 p.m. on January 24, the endorsement stamp would not have reflected that date. The items were returned for insufficient funds after 6 p.m. on January 28, 1986.

The 17 checks in check group B had endorsement stamps which indicated they were received by the Federal Reserve on January 24, were processed by the Federal Reserve on January 27, 1986, and made available for pickup by the BOC before 2 p.m. on January 27, 1986. The Federal Reserve manifest reflected that boxes were available for pickup by BOC by 11:45 a.m. BOC returned those items for insufficient funds on January 29, 1986.

The eight checks in check group C had stamps which indicated that the Federal Reserve received them on January 28, 1986. According to Snodgrass, the Federal Reserve made the checks available to the BOC courier after noon on January 28 and before 2 p.m. If the checks had not been made available until after 2 p.m., the Federal Reserve's records would not have reflected that date. The checks were returned by BOC to the Federal Reserve on January 30, 1986, after 2 p.m.

The deposition testimony of Thomas Bednar, the Federal Reserve supervisor for returned items, indicated that he had reviewed and researched the checks in question. Based upon his research, he determined that the checks in group A had been made available by the Federal Reserve for pickup by the courier at approximately noon on January 24, 1986, and were returned on January 28, 1986, after 2 p.m. His research indicated that the checks in group B were made available by the Federal Reserve for pick at 11:45 a.m. on January 27, 1986, but were not returned until after 2 p.m. on January 29, 1986.[8] The checks in group C were made available for pick up at approximately noon on January 28, 1986, and were not returned until after 2 p.m. on January 30, 1986.

The deposition testimony of Gary Farnam, the manager of operations for Decimus Corporation, and Al J. Fairman, the manager of customer service

---

[8]Bednar based his statements for check group B on an actual manifest form signed by U.S. Courier. No manifests were available with respect to check groups A and C.

and facilities for Decimus, established that U.S. Courier would pick up BOC's checks from the Federal Reserve in the afternoon or early evening, sometime between 2 p.m. and 7 p.m. The courier would then bring the checks directly to Decimus, where they would be held until the following morning for processing.

The deposition testimony of John Ficht, the chief operating officer of U.S. Courier, and John Morgan, the operations manager for Decimus, established that according to the schedule prescribed by Decimus, BOC checks were scheduled to be picked up at 6 p.m. from the Federal Reserve. The checks would then be delivered to Decimus no later than 7 p.m. The records of U.S. Courier indicated that on January 24, 27, and 28, 1986, the pickups were made at their normal time.

The deposition testimony of Christine Sun, a BOC bookkeeper, established that Decimus used U.S. Courier Corporation as a messenger. Ordinarily a courier would pick up checks from Decimus at 7:30 a.m. for delivery to BOC. At approximately 8 a.m. that same day, Sun would process those checks and return any of those checks which would not be paid for insufficient funds.

BOC's opposition, directed to whether the checks were made available by 2 p.m. on each of the days in question, was supported principally by the declaration of an expert witness, Lee Gunderson. Mr. Gunderson had several years of experience in the banking industry and was an independent consultant to financial institutions. He had previously served as a bank president, a director of a savings and loan, and president of a bankers' professional association. Gunderson based his opinions on the following, "I have had extensive direct, hands-on experience within the U.S. banking industry; I am personally familiar with customary practices and usages among banks that employ various clearinghouses that clear checks. I am aware of how UCC Article 4 procedures operate, how they are understood within the relevant industry, how custom and practice fills in ambiguities and interstices within the statutory and regulatory format relevant for Article 4 purposes, particularly insofar as check processing operates. I am familiar with . . . all documents promulgated by the Federal Reserve. I am also familiar with clearinghouse procedures employed by private check clearinghouses." Gunderson's opinion was that Circular 1 did not apply to the situation at hand, but that section 4104, subdivision (h) and the federal regulations issued by the Federal Reserve Board (12 C.F.R. § 229.36 (1994)), as well as industry-wide business practices dictated that actual physical receipt by a bank's processing agent, in this case, Decimus, commences the start of the midnight

deadline rule. He noted that the Federal Reserve never operated precisely on schedule and that the noon target for pickup was frequently not met.

Gunderson opined that oral notice of dishonor is sufficient for purposes of the Commercial Code midnight deadline rule. He also opined that the fraud, illegal actions, and negligence of LANB would be a complete defense to a violation of the midnight deadline rule, referring to industry-wide understanding and to proposed amendments to the Commercial Code then pending in the Legislature.

BOC also offered evidence in opposition that the Federal Reserve had written a letter to BOC indicating that it had processing difficulties during the week of January 22, 1986, which caused some checks to be dispatched late. In addition, BOC submitted the deposition testimony from a check processor that pickups from the Federal Reserve may sometimes be late because of computer malfunctions.[9]

■ Even construing LANB's evidentiary support strictly and BOC's support liberally as we are required to do in reviewing a grant of summary judgment (Code Civ. Proc., § 437c; *Oswald Machine & Equipment Inc.* v. *Yip* (1992) 10 Cal.App.4th 1238, 1243 [13 Cal.Rptr.2d 193]; *Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505 [285 Cal.Rptr. 385]), BOC has not raised a triable issue with respect to the time the checks were made available for pickup from the Federal Reserve.[10]

Neither Gunderson nor Garcia had personally reviewed the checks in question as had the Federal Reserve and Decimus employees, and could not specifically point to any breakdown in operations on the dates in question. The evidence submitted by BOC merely established a basis for speculation and was not sufficient to challenge the evidence presented by LANB that each batch of checks was made available by 2 p.m. of the day in question. We conclude no material triable issue of fact existed on this issue. (See *Barrett* v. *Atlas Powder Co.* (1978) 86 Cal.App.3d 560, 564-567 [150 Cal.Rptr. 339]; *Craig Corp.* v. *County of Los Angeles* (1975) 51 Cal.App.3d 909, 915 [124 Cal.Rptr. 621].)

---

[9]The check processor, Jose Garcia, was employed by City National Bank, which processes checks for many other banks.

[10]We discuss Gunderson's legal conclusion relating to actual delivery of the items versus when the items are made available, *infra*, at part I.B.1. The remainder of his conclusions relating to oral notice and possible defenses are legal issues which are discussed in section I.B.2. and 3.

B. *Summary judgment was proper as a matter of law.*

Crucial to our discussion of the construction of section 4302 is a discussion of our published opinion relating to the initial summary judgment motions by the parties. In *LANB I, supra,* 229 Cal.App.3d 1267, we reviewed case law from numerous other jurisdictions which followed the Uniform Commercial Code midnight deadline rule and concluded that "the rule of strict liability afforded by section 4302 does displace the defense that appellant's own negligence caused its loss." (*Id.* at p. 1278.) We noted that " 'the UCC, however, for the most part does not look at actual fault. . . . Instead, it places responsibility on the party which ordinarily would be in the best position to prevent the loss. . . . Such a result accomplishes two purposes: first, it increases the efficiency and fraud-resistance of the banking system by placing upon those best able to guard against it the responsibility for preventing fraud . . . , and, second, it speeds the resolution of disputes by establishing clear rules of liability which do not depend heavily upon the specific facts of individual instances of fraud. . . .' " (*Ibid.,* fns. and citations omitted.)

In *LANB I,* BOC raised two issues which must be reviewed before we continue with this case. ■ First, BOC argued that LANB needed to prove that it relied upon BOC's failure to give notice before the midnight deadline before LANB could prove it was damaged. BOC relied upon two cases for this proposition: *United States Fid. & Guar. v. Federal Reserve Bank* (S.D.N.Y. 1985) 620 F.Supp. 361; and *United States Fid. v. Fed. Reserve Bank* (S.D.N.Y. 1984) 590 F.Supp. 486. Secondly, BOC argued that on January 27, 1986, Ms. Au was given verbal notice that there were insufficient funds in the BOC account to cover the checks and that BOC would return the checks.

We reviewed the cases cited by BOC and the evidence presented and concluded as follows: "In the present case, by contrast [to the two cases cited by BOC], there is *no* evidence [LANB] had learned before releasing the funds that there was no money in the account of Golden Fields Leasing Company, Inc., and the evidence is disputed as to exactly when [LANB] learned there were insufficient funds to cover the amounts of the various checks. Although [BOC] asserts [LANB] learned on January 27, 1986, through oral communication from [BOC's] employees that there were insufficient funds in the account and that [BOC] would not honor any other checks drawn on that account, [LANB] provided evidence [BOC] did not inform [LANB] that any further checks submitted would be dishonored. [¶] In addition, despite whatever [BOC] communicated to Ms. Pou San Au, it

has not been clearly established that [BOC's] oral notification satisfied the statutory definition of 'notice of dishonor.' Section 4302 provides that a payor bank either must return the item or '*send notice* of dishonor' prior to expiration of its midnight deadline. It is obvious from the wording of the statute that written notice is contemplated. We reject the conclusion urged by [BOC] that [LANB] must establish that it relied upon [BOC's] failure to transmit 'notice of dishonor' before the midnight deadline in order to recover for breach of the liability created by section 4302 where, as here, [LANB] had no knowledge, at the time the checks were deposited or funds were released, that the checks were uncollectible." (*LANB I, supra,* 229 Cal.App.3d at p. 1280, italics in original.)

Because the matter was before us in the context of summary judgment, we indicated that "[t]he parties remain free to develop additional evidence at trial which might enable them to renew the arguments raised before this court." (229 Cal.App.3d at pp. 1280-1281.)

    1.   *The items were received by BOC when the Federal Reserve made them available.*

As previously indicated, BOC contends that the midnight deadline did not begin to run until it actually received the checks and not when the Federal Reserve made the checks available for pickup. This argument was based on the opinion of Gunderson in interpreting the Uniform Commercial Code and Federal Reserve practices. This is a legal issue, therefore, it was proper for the trial court to resolve this portion of the motion as a matter of law. (*C.L. Smith Co.* v. *Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 743 [135 Cal.Rptr. 483].)

In *LANB I*, we held that Decimus Corporation was BOC's agent for receipt. "Were we to conclude otherwise, a payor bank always could avoid the operation of section 4302 by interposing such an entity for receipt of items from the presenting bank, and that entity indefinitely could delay the final disposition of an item, thus defeating the protection sought to be afforded by imposing strict deadlines for final payment or 'dishonor.' " (229 Cal.App.3d at p. 1280.)

Here, BOC raises the further contention that availability for pickup by the Federal Reserve does not constitute "receipt" by BOC such that the midnight deadline rule begins to run. For reasons similar to those first quoted from *LANB I*, we find this contention to be without merit. The purpose of the midnight deadline rule is to ensure prompt notification. If the midnight deadline rule did not begin to run until a bank or its agent actually decided

to pick up the checks from the Federal Reserve, a bank might delay the midnight deadline indefinitely, thereby "defeating the protection sought to be afforded by imposing strict deadlines for final payment or 'dishonor.'" (*LANB I, supra,* 229 Cal.App.3d at p. 1280.)

2. *The midnight deadline was not met when BOC's tellers orally informed Mrs. Au that the Golden Fields account did not have any funds.*

■  BOC renews its argument from *LANB I* that LANB received notice of dishonor of the checks by virtue of Mrs. Au's conversation with the BOC tellers. In *LANB I,* we did not directly rule on the issue but we noted that: "It is obvious from the wording of the statute [section 4302] that written notice is contemplated." (229 Cal.App.3d at p. 1280.)

In keeping with the objectives of certainty and finality in bank operations (see *SOS Oil* v. *Norstar Bank of Long Island* (1990) 76 N.Y.2d 561 [561 N.Y.S.2d 887, 892, 563 N.E.2d 258]), we find no compelling reason for finding that the oral notice was sufficient to qualify as the notice required in section 4302.

First of all, as we noted in *LANB I,* we rejected an argument by BOC that reliance was necessary in order for LANB to prevail. In that connection, BOC argued oral notice was given by its tellers before the checks were received at BOC. The key to our ruling was that the discussion between Ms. Au and the tellers at BOC did not occur *until after LANB had made payments out of the account.* This was in contrast to the case of *United States Fid. & Guar.* v. *Federal Reserve Bank, supra,* 620 F.Supp. at page 373, where there had been oral notice to the depository bank of an intent to dishonor *before* the bank paid out the proceeds to the check kiters. There is no doubt but that LANB may have been at fault in some degree for making early payments, but that is another issue which we discuss later in this opinion. Therefore, to the extent that BOC is arguing oral notice was sufficient either to estop LANB from claiming return of the proceeds or lack of reliance, *LANB I* disposes of the argument.

BOC cites to section 3508 which defines "notice of dishonor" as notice "given in any reasonable manner" and that "[i]t may be oral or written and in any terms *which identify the instrument and state that it has been dishonored.*" (Italics added.) This apparent conflict between "oral" notice in section 3508 and "written" notice in section 4302 was considered by the Michigan court of appeals in *Mut. Sav. & Loan* v. *Nat. Bank of Detroit* (1990) 185 Mich.App. 591 [462 N.W.2d 797], which noted that the Uniform Commercial Code's definition of "send," that is, "to deposit in the mail or deliver for transmission" (§ 1201, subd. (38)) necessarily implies a written instrument, and that

the Uniform Commercial Code section 4102 provides that in the event of a conflict between the provisions of article 4 and article 3, the provisions of article 4 govern. (462 N.W.2d at p. 799.) Therefore, written notice is required and it was not timely given in this case.[11]

### 3. Strict Liability

BOC contends that by virtue of LANB's own actions, it cannot escape liability for the worthless checks notwithstanding BOC's failure to meet the midnight deadline.

We addressed this issue to some extent in *LANB I.* We held that failure to meet the midnight deadline makes the payor bank strictly liable to the depository bank notwithstanding the fact that it may also have fault. BOC now indicates, correctly, that we reserved judgment on any further arguments to be made by the parties based upon additional evidence not then presented to the court.

In opposition to the motion for summary judgment, BOC raised a number of issues which it also sought to raise in a proposed amended answer and proposed cross-complaint. The opposition and proposed amended answer sets forth the following affirmative defenses: (1) that LANB is barred from recovery by virtue of its illegal acts, which were making loan advances (i.e., cashing the checks) in excess of statutory limits (12 U.S.C. § 84 requires that a bank must make an unsecured loan for more than 15 percent of its capital to any one customer), for failing to report the cash withdrawals by Lam and Wong to the United States Treasury, and that it "recklessly endangered the financial structure of a national bank"; (2) that the midnight deadline rule is unconstitutional; (3) that LANB engaged in a pattern of fraud by failing to check if there were adequate funds in the BOC account before cashing the checks, by making loans in excess of statutory limits, by failing to have a control system that prevented tellers from cashing checks above a stated amount; that it intentionally violated federal limits on lending funds "in order to benefit its customer at the expense of BOC"; by failing to report the cash withdrawals to the United States Treasury; (4) that LANB is estopped from invoking the violation of the midnight deadline rule by virtue of its

---

[11]In any event, even if we were to hold that oral notice was acceptable for purposes of the midnight deadline rule pursuant to section 3508, the oral notice relied upon here is insufficient to meet the requirements of that section. In Mrs. Au's conversations with the BOC's tellers on January 27, 1986, no specific checks or amounts were referred to. In fact, at that point, BOC had not received any of the checks written by Lam and Wong. BOC's response that the Golden Fields account did not have sufficient funds at that specific time and that the checks would not be honored is not sufficient within the terms of the statute.

knowledge of Decimus's operations and its conduct in cashing the checks; (5) that LANB failed to state a cause of action, "since the scope and makeup of Article 4 of the Commercial Code and regulations implementing the terms thereunder do not contemplate such recovery."

BOC's cross-complaint sought restitution from LANB, Lam, Wong and Golden Fields, based upon the fraud of each of them, and a claim for recoupment based on *proposed* amendments to sections 3302, 3305 and 4302.[12]

On appeal, BOC primarily argues that LANB, through Ms. Au, was either actively involved in the fraud or was so careless by violation of the various statutes and regulations relating to banking practices, that LANB should not be allowed to profit from its own wrongdoing. BOC relies quite heavily upon the above amendments to the Commercial Code, especially to section 4302 which BOC claims excepts fraud from the strict liability provisions of the midnight notice requirements.[13]

In *LANB I, supra*, we discussed the issue of fault without any specific reference to fraud, or violation of banking statutes or regulations, but certainly in the context of comparative fault by the depository bank. While many of the cases we discussed, and some of the language we used, referenced the term negligence, it is clear that the concept of strict liability includes denial of defenses based upon a much broader scope of fault than negligence.

In adopting strict liability for commercial banking transactions, we did note the distinction between apportioning fault in tort actions and in the context of commercial banking transactions: " 'In tort law courts have equated fairness with fault. The rule of comparative negligence is a perfect

---

[12]The amendments were ultimately adopted by the Legislature in 1992. (§§ 3302, 3305 and 4302; Stats. 1992, ch. 914, §§ 6, 38.)

[13]Section 4302 now reads: "(a) If an item is presented to and received by a payor bank, the bank is accountable for the amount of either: [¶] (1) A demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline. [¶] (2) Any other properly payable item unless, within the time allowed for acceptance or payment of that item, the bank either accepts or pays the item or returns it and accompanying documents. [¶] (b) The liability of a payor bank to pay an item pursuant to subdivision (a) is subject to defenses based on breach of a presentment warranty (Section 4208) *or proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the payor bank.*" (Italics added.)

expression of this principle. [¶] The UCC, however, was designed to facilitate commerce primarily by guiding and making predictable the consequences of behavior,' and its loss apportionment function is secondary to this primary function. ([*United States Fid. & Guar.* v. *Federal Reserve Bank, supra,* 620 F.Supp.] at p. 370; *Town & Country State Bank* v. *First State Bank* (Minn. 1984) 358 N.W.2d 387, 395.)" (*LANB I, supra,* 229 Cal.App.3d at p. 1278.)

More recently, in the case of *Chicago Title Ins. Co.* v. *California Canadian Bank* (1991) 1 Cal.App.4th 798 [2 Cal.Rptr.2d 422], the issue of comparative fault was revisited, not in the concept of negligence, but the payor bank argued that it should be allowed to raise the defenses of waiver, estoppel, and unclean hands, among others. (*Id.* at p. 809.) In addressing this argument, the court first turned to our discussion in *LANB I* relating to the interplay between sections 1103[14] and 4302: " 'As [the Bank] suggests, section 1103 provides that general principles of law, which would include the defense that a party's own negligence caused its loss, may apply *where not displaced by specific provisions of the Commercial Code.* As the above cases indicate, however, the rule of strict liability afforded by section 4302 does displace the defense that [the Company's] own negligence caused its loss. In order to further the statutory objectives of certainty and finality, a bank that fails to return a check by the midnight deadline is deemed to have paid it and thus is held accountable.' [Citations.]" (*Id.* at p. 809, italics added and omitted.)

The court then discussed the broader concepts of estoppel, waiver, unclean hands, illegality of the underlying transactions *and fraud*: "It is important to bear in mind in this context that the Uniform Commercial Code is designed to banish from the law governing timely return of dishonored checks such fact-based theories of liability and defense as negligence, fault, estoppel, intentional tort, or illegality of the underlying transaction in the overriding public interest of promulgating the integrity, certainty, and finality of commercial transactions. Consequently, the Uniform Commercial Code establishes a more mechanical system, characterized by certainty and finality, and based only upon facts unlikely to be disputed in litigation—such as the date stamped on a check upon its receipt, the date it was returned as dishonored, or the fact of whether the check was not readable by computer or was presented posthumously for payment. [¶] . . . We are also concerned

---

[14]Section 1103 reads: "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, *fraud,* misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (Italics added.)

that allowing the Bank to escape the consequences of its delay by indulging its claim of fault or fraud on the part of the [title insurance company], which claim is factually unrelated to the actual mechanics of the check return procedure—i.e., a fraud which did not cause the Bank to miss its deadline, would begin to cause the system of reciprocal obligations underlying commercial transactions to unravel in a mass of time-consuming litigation, such as we have glimpsed in these protracted proceedings." (1 Cal.App.4th at pp. 811-812.)

Accordingly, the court rejected the bank's request for leave to amend to assert a claim for restitution, and its attempt to raise the defenses of estoppel, waiver, and unclean hands. (1 Cal.App.4th. at p. 809.)

Other state courts have also followed this rule. "[B]anking laws render a payor bank strictly liable for instruments which it fails to dishonor timely, except in certain limited circumstances, none of which exist [even when a customer's check kiting scheme is discovered by both the depositary and payor bank prior to dishonor.]" (*Schwegmann Bank & Tr.* v. *Bank of Louisiana* (La.Ct.App. 1992) 595 So.2d 1185, 1189.)

The Supreme Court of Minnesota has also observed that, "The present banking system under which an enormous number of checks are processed daily could not function effectively if banks were not required to make prompt and effective decisions on whether to pay or dishonor checks. [Citations.]" (*Town & Country State Bank* v. *First State Bank* (Minn. 1984) 358 N.W.2d 387, 395.)

It is clear, in light of the holdings in *LANB I*, *supra*, 229 Cal.App.3d 1267, and *Chicago Title Ins. Co.* v. *California Canadian Bank*, *supra*, 1 Cal.App.4th 798, that fraud and the other defenses attempted to be raised by BOC were irrelevant to the transactions here which occurred in 1986. After the *Chicago Title* case was handed down, the Legislature apparently decided that fraud should not be exempted as a defense and it adopted the amendment to section 4302.[15] Strict liability is the law relating to these transactions and the defenses raised and theories plead in the cross-complaint were irrelevant to determination of the motion for summary judgment.[16]

---

[15]See the new language of section 4302 set forth in footnote 13.

[16]As indicated in *Chicago Title*, *supra*, the cases do suggest that fraud perpetrated in an attempt to have the payor bank miss the midnight deadline is a defense to the deadline. However, there is no suggestion or evidence here that this is the type of fraud BOC is relying upon.

II. *The court did not err in denying the motion to continue the summary judgment hearing or the motion to add affirmative defenses.**

. . . . . . . . . . . . . . . . . . . . . . .

III. *Prejudgment interest was incorrectly calculated.*

The judgment prepared by LANB after it successfully moved for summary judgment provided for interest at the rate of 10 percent from the date the checks were cashed until paid.

The relevant section of the Civil Code regarding prejudgment interest is Civil Code section 3289, subdivision (b), which provides that, "If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach." Civil Code section 3288 provides that "In an action for the breach of an obligation not arising from contract, . . . interest may be given, in the discretion of the jury."

In the absence of any legislative act to the contrary, the rate of prejudgment interest is 7 percent. (Cal. Const. art. XV, § 1; *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 434 [264 Cal.Rptr. 779].)

BOC contends that the damages were based on a violation of a statute, section 4302, and were not based upon any contract with LANB, and thus the trial court erroneously ordered interest to accrue at 10 percent.

LANB argued that section 4103, subdivision (b) provides that "Federal Reserve regulations and operating circulars, clearinghouse rules, and the like, have the effect of agreements . . . whether or not specifically assented to by all parties interested in items handled." The trial court agreed that the nature of the transactions was contractual, based upon the checks themselves, the Federal Reserve regulations, and "the general relationship of the banks, through the clearing house system, to one another."

The case of *Bank of America v. Security Pacific Nat. Bank* (1972) 23 Cal.App.3d 638 [100 Cal.Rptr. 438] is instructive. There, a bank brought an action to recover funds from checks returned after the expiration of the midnight deadline. In holding that the three-year statute of limitations for actions based on statutory liability and not the four-year statute of limitations

*See footnote, *ante*, page 726.

for actions based on a contract applied, the court concluded: "The sight draft or demand item is no more than an instrument serving as a link in the chain establishing a cause of action and does not in itself contain any contract or term of agreement to [comply with the midnight deadline rule.]" (*Id.* at p. 646.) The liability was "created by statute and the action would be barred by the three-year statute of limitations pertaining to such an action. [Citation.]" (*Id.* at p. 644.)

Moreover, the United States Court of Appeals for the Fifth Circuit held in *Union Bank of Benton, Ark.* v. *First Nat. Bank* (5th Cir. 1982) 677 F.2d 1074, 1080, damages arising from a breach of the midnight deadline rule resulted from a statutory violation, not from a breach of contract, and prejudgment interest was awarded accordingly.

Similarly here, we find the liability of BOC to LANB was caused specifically and exclusively by virtue of its failure to return the checks by the midnight deadline and that the applicable prejudgment interest rate should have been 7 percent.

### DISPOSITION

The matter is remanded to the superior court for recalculation of prejudgment interest at the rate of 7 percent instead of 10 percent as to each cause of action but otherwise is affirmed. Inasmuch as this recalculation appears to be a purely ministerial act, the parties are invited to stipulate to the proper amount of prejudgment interest. Respondent LANB is awarded its costs on appeal.

Woods (A. M.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied February 17, 1995, and appellant's petition for review by the Supreme Court was denied April 13, 1995. George, J., did not participate therein.