#25573-a-JKK

**2010 S.D. 83**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

HEARTLAND STATE BANK, a South
Dakota Banking Corporation,                                    Plaintiff and Appellant,

>         v.

AMERICAN BANK & TRUST, a South
Dakota Banking Corporation f/k/a
Hand County State Bank,                                    Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
HAND COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TIM D. TUCKER
Judge

\* \* \* \*

JAMES M. CREMER of
Bantz, Gosch & Cremer, LLC                     Attorneys for plaintiff
Aberdeen, South Dakota                          and appellant.

TIMOTHY M. ENGEL
JUSTIN L. BELL of
May, Adam, Gerdes and Thompson, LLP            Attorneys for defendant
Pierre, South Dakota                            and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON AUGUST 24, 2010

OPINION FILED **10/27/10**

#25573

KONENKAMP, Justice

[¶1.]        When a bank returned a series of checks for insufficient funds, the returns were challenged as untimely.  Under the Uniform Commercial Code midnight-deadline rule for check processing, a payor bank must, after receipt of a check presented for payment, pay the check, return it, or send notice of dishonor by midnight of the next banking day.  Otherwise, the payor bank becomes "accountable" for the amount of the check.  Because, here, the bank returned the checks by midnight after receiving them the day before by postal delivery, the return was timely.  We affirm the circuit court's grant of summary judgment.

## Background

[¶2.]        Highmore Auction Sales wrote eight checks on its account with American Bank & Trust payable to HS Cattle.  HS Cattle deposited three checks with Heartland State Bank on April 4, 2002, and five checks on April 8, 2002, all totaling $799,159.47.  Heartland gave HS Cattle credit for the checks when they were deposited.

[¶3.]        Heartland, as the "depositary bank," routed the checks to a "collecting bank," the Federal Reserve Bank, in Minneapolis, Minnesota.  *See* SDCL 57A-4-105(2) and (3).  The Federal Reserve Bank received three checks on April 8 and the remaining five checks on April 9, 2002.  It processed the checks on the same days they were received, made provisional settlements, and bundled them in two cash letters.  *See* SDCL 57A-4-104(a)(11) (defining settle).  Due to delays in the U.S. Postal Service, both cash letters along with the checks were delivered to American, the "payor bank," at its mailing address on April 10, 2002.  *See* SDCL 57A-4-105(5).

-1-

American picked the checks up the same day. It then returned the checks for insufficient funds before midnight on April 11, 2002. By the time Heartland received the returned checks, it lost its ability to recover the $799,159.47 because Highmore Auction Sales was "broke" and HS Cattle had already spent the money.

[¶4.]        When a payor bank receives a check, it is considered "presented," meaning a demand for payment has been made upon the party obligated to pay the check. SDCL 57A-3-501(a). Once a check has been provisionally settled through a Federal Reserve Bank, a payor bank upon receipt can effect final payment in several ways. SDCL 57A-4-215(a)(1) - (3). But the payor bank may also revoke a provisional settlement and return the check, if the payor bank has not made final payment and returns the check before the midnight deadline. SDCL 57A-4-301(a)(1); SDCL 57A-4-302(a)(1). The "midnight deadline" is the "next banking day following the banking day on which [the bank] *receives* the relevant item or notice or from which the time for taking action commences to run, whichever is later[.]" SDCL 57A-4-104(a)(10) (emphasis added). If the midnight deadline is not met, the payor bank becomes "accountable" — strictly liable — for the amount of the check regardless of whether there were sufficient funds in the customer's account to cover payment.[1] SDCL 57A-4-302; *see also* SDCL 57A-4-215(a)(3).

[¶5.]        Heartland brought suit to recover the amount of the eight checks, contending that the returns were untimely. Both banks moved for summary judgment. Heartland asserted that American failed to meet the midnight deadline

---

1.    The midnight deadline rule is subject to defenses not pertinent here. SDCL 57A-4-302(b); SDCL 57A-4-109(b) (stating an exception).

because American received the checks when they were made available for pickup, not when they were physically delivered. *See* Federal Reserve Operating Circular No. 3, Section 9.2 (2002 version).

[¶6.]     After a hearing, the circuit court granted summary judgment in favor of American. The court interpreted South Dakota's version of the Uniform Commercial Code (UCC) and federal regulations to conclude that American did not receive the checks until the U.S. Postal Service delivered them to American's mailing address on April 10, 2002. Heartland appeals on the ground that the court erred when it held that American did not receive the checks earlier than April 10, 2002. We review the circuit court's summary judgment de novo. *Horne v. Crozier*, 1997 S.D. 65, ¶ 5, 565 N.W.2d 50, 52.

## Analysis and Decision

[¶7.]     Under the UCC rules governing check processing, the midnight deadline for a bank is "midnight on its next banking day following the banking day on which [the bank] receives" the check. SDCL 57A-4-104(a)(10). Because the midnight deadline clock could not start until American received the checks, we must determine what *receive* means in SDCL 57A-4-104(a)(10).[2]

[¶8.]     Federal Reserve Regulation CC assists in this definition:

> A check is considered *received* by the paying bank when it is *received*:
>
> (1) At a location to which delivery is requested by the paying bank;

---

2.     Heartland concedes that American was not capable of electronic check presentment at the time the eight checks were written.

(2) At an address of the bank associated with the routing number on the check, whether in magnetic ink or in fractional form;

(3) At any branch or head office, if the bank is identified on the check by name without address; or

(4) At a branch, head office, or other location consistent with the name and address of the bank on the check if the bank is identified on the check by name and address.

12 C.F.R. 229.36(b) (emphasis added). According to the Federal Reserve, "[t]he paying bank is considered to *receive* a cash item when it is delivered as requested, or when it is made available for pickup as arranged, whether or not the paying bank picks up the item at that time." Operating Circular No. 3, Section 9.2 (2002 version) (emphasis added). Federal Reserve operating circulars have the effect of binding agreements on participating banks. SDCL 57A-4-103(b).

[¶9.] Heartland contends that by choosing postal delivery for the checks, American made the U.S. Postal Service its courier. By this reasoning, the returns were untimely because American received the checks on April 8 and 9, 2002, when the Federal Reserve Bank (1) delivered them to "American's courier," or (2) made them "available for pickup by American's courier[.]"

[¶10.] There is no evidence in the record that American made special arrangements with the Federal Reserve Bank for the checks to be picked up. In accord with Operating Circular No. 3, Section 9.2 (2002 version), "A paying bank . . . may *arrange* to pick up cash items at our premises. The paying bank is considered to receive a cash item . . . when it is made available for pickup as arranged[.]" (Emphasis added.) American's arrangement with the Federal Reserve Bank was to have the checks mailed to American's mailing address. Operating Circular No. 3,

Section 9.2 (2002 version) provides that "[t]he paying bank [American] is considered to receive a cash item [check] when it is delivered as requested[.]" Here, the checks were delivered, as requested, to American's mailing address on April 10, 2002. *See* SDCL 57A-4-204. It was on that date that the checks should be considered received.

[¶11.]     Heartland cites *Los Angeles Nat'l Bank v. Bank of Canton*, in which a California appeals court held that the midnight deadline began to run on the date the items were available for pickup at the Federal Reserve Bank. 31 Cal.App.4th 726 (Cal. Ct. App. 1995). Heartland quotes as controlling the following language: "The purpose of the midnight deadline rule is to ensure prompt notification. If the midnight deadline rule did not begin to run until a bank or its agent actually decided to pick up the checks from the Federal Reserve Bank, a bank might delay the midnight deadline indefinitely, thereby 'defeating the protection sought to be afforded by imposing strict deadlines for final payment or "dishonor."'" *Id.* at 739-40 (citation omitted).

[¶12.]     While we agree that the purpose of the midnight deadline is to ensure prompt notification, the payor bank in the *Los Angeles Nat'l Bank* case, the Bank of Canton, used a check processor whose courier did not pick the checks up at the Federal Reserve Bank until 5:00 p.m. The processor then delivered the checks to the Bank of Canton the next day. Because of the agency arrangement, the midnight deadline rule began to run on the date the items were made available by the Federal Reserve Bank for the courier to pick up. *See* Operating Circular No. 3, Section 9.2 (2002 version). Here, however, there was no arrangement by American

with an agent, courier, or processor, and thus *Los Angeles Nat'l Bank* is not analogous. Heartland cites no authority placing the U.S. Postal Service in an agency relationship with the banks to which it delivers mail.

[¶13.] Regulation CC supports the conclusion that the checks were received on April 10, 2002. A "check is considered *received* by a paying bank when it is *received* . . . [a]t a location to which delivery is requested by the paying bank[.]" 12 C.F.R. 229.36(b)(1) (emphasis added). American requested that the Federal Reserve Bank deliver the checks to its mailing address. The checks were so delivered on April 10, 2002. Because American had until "midnight on its next banking day following the banking day on which it" received the checks, American had until midnight April 11, 2002 to return the checks. As the checks were returned by that date, the circuit court properly granted summary judgment to American.

[¶14.] Affirmed.

[¶15.] GILBERTSON, Chief Justice, and ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.