[No. B128574. Second Dist., Div. Four. Dec. 9, 1999.]

GENTNER AND COMPANY, INC., Plaintiff and Respondent, v. WELLS FARGO BANK, Defendant and Appellant.

**COUNSEL**

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass and Susan K. Jaimson for Defendant and Appellant.

Paone Callahan McHolm & Winton, Richard J. Foster and Alan J. Kessel for Plaintiff and Respondent.

**OPINION**

**CURRY, J.—** This case presents the issue of whether a bank that erroneously accepts an endorsed check on which a stop payment order has been placed, and issues a cashier's check to the payee in the same amount, can thereafter refuse to pay the cashier's check. We conclude that as between

the bank and a payee who acts in good faith, the Commercial Code[1] clearly requires the bank to suffer the loss occasioned by its error in accepting or paying a check covered by a stop payment order, and that the result is the same whether the check is paid in cash or exchanged for a cashier's check.

### FACTUAL AND PROCEDURAL BACKGROUND

With one notable exception, the parties do not dispute the essential facts. L&M Home Health Corporation (L&M) had a checking account with appellant Wells Fargo Bank. L&M engaged respondent Gentner and Company, Inc. (Gentner) to provide consulting services, and paid Gentner for services rendered with a check drawn on its Wells Fargo account in the amount of $60,000, dated September 23, 1996. Eleven days later, on October 4, 1996, L&M orally instructed Wells Fargo to stop payment on the check.[2] Eleven days after that, on October 15, 1996, Gentner presented the L&M check to Wells Fargo for payment. On the same date the teller issued a cashier's check, payable to Gentner, in the amount of $60,000. On November 5, 1996, Wells Fargo placed a "stop payment order" on the cashier's check.[3] On January 15, 1997, Gentner deposited the cashier's check at another bank, but it was not honored and was returned stamped "Payment Stopped."

Gentner brought suit against Wells Fargo for wrongful dishonor of the cashier's check. The case was tried to the court on a paper record, through use of trial briefs, declarations, and deposition testimony. The trial court ruled in favor of Gentner, finding that Gentner was a holder in due course of the cashier's check, and entered judgment in the amount of the check plus prejudgment interest. Wells Fargo noticed a timely appeal.

[1] By "Commercial Code" we mean the California Uniform Commercial Code, the version of the Uniform Commercial Code enacted in California. Unless otherwise specified, all statutory references are to this code.

[2] Gentner disputes that a stop payment order was ever made. Joseph Chow, manager for one of Wells Fargo's branches, stated that the bank's computerized audit report showed that "on October 4, 1996 L&M orally placed a stop payment order on the L&M check by telephoning Wells Fargo's National Business Banking Center . . . ." Gentner disputes the accuracy of this record because on the day it presented the check for payment, the teller and the branch manager spent at least 20 minutes researching, among other things, whether there was a stop order and apparently found nothing since they went ahead with the transaction. The parties further dispute whether the trial court made a finding as to if and when the stop order became effective. Because we conclude that Wells Fargo should not have refused to pay the cashier's check even if its version of the facts is correct, we do not resolve these disputes.

[3] Technically, a bank cannot place a stop payment order on its own check. Stop payment orders are from a customer (drawer) to a bank (drawee). (§ 4403.) A "cashier's check" is "a draft with respect to which the drawer and drawee are the same bank . . . ." (§ 3104, subd. (g).) We presume Wells Fargo means by "stop payment order" in this context that it promulgated some kind of internal instruction blocking payment of the cashier's check.

DISCUSSION

I

On appeal, the parties dispute whether Gentner was a holder in due course of the cashier's check. The attributes of a holder in due course are set forth in section 3302, which requires that it take the instrument "(A) for value, (B) in good faith, (C) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (D) without notice that the instrument contains an unauthorized signature or has been altered, (E) without notice of any claim to the instrument described in Section 3306, and (F) without notice that any party has a defense or claim in recoupment described in subdivision (a) of Section 3305."[4] (§ 3302, subd. (a)(2).) In addition, a party can be a holder in due course only if the instrument "when issued or negotiated to the holder" did not "bear such apparent evidence of forgery or alteration or [wa]s not otherwise so irregular or incomplete as to call into question its authenticity." (*Id.*, subd. (a)(1).)

It is true, as Wells Fargo asserts, that "value" has a different definition than the more familiar contractual term "consideration." Under section 3303, "[a]n instrument is issued or transferred for value" if: "(1) The instrument is issued or transferred for a promise of performance, to the extent the promise has been performed. [¶] (2) The transferee acquires a security interest or other lien in the instrument other than a lien obtained by judicial proceeding. [¶] (3) The instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due. [¶] (4) The instrument is issued or transferred in exchange for a negotiable instrument. [¶] (5) The instrument is issued or transferred in exchange for the incurring of an irrevocable obligation to a third party by the person taking the instrument." (§ 3303, subd. (a)(1)-(5).) As can be seen, the most significant differences are that "value" can include past performance or "antecedent claims," something which is not generally true of contractual consideration, and a promise to perform in the future—the most typical form of contractual consideration—constitutes "value" only to the extent it has already been performed. For purposes of the Commercial Code, "[i]f an instrument is issued for value . . . , the instrument is also issued for consideration." (§ 3303, subd. (b).)

The reason achieving the status of a holder in due course is important can be understood by reference to section 3305, which sets forth the recognized

---

[4]Section 3306 has to do with another party's claims "of a property or possessory right in the instrument or its proceeds . . . ." Section 3305 is discussed *infra*.

defenses to an obligation to pay an "instrument" such as a check. The only defenses available against a holder in due course are listed in section 3305, subdivision (a)(1), and include "infancy" of the obligor, "duress," lack of legal capacity, illegality of the transaction which "nullifies the obligation," fraud "that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms," and discharge of the obligor by bankruptcy. When the instrument is not in the hands of a holder in due course, the obligor can raise: all defenses set forth in any other "section of this division"; any defense "that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract"; or "[a] claim in recoupment" which the obligor has against the original payee of the instrument "if the claim arose from the transaction that gave rise to the instrument . . . ." (§ 3305, subd. (a)(2) and (3).)

Wells Fargo contends that the holder-in-due-course doctrine does not apply because the cashier's check was purchased by Gentner for payment to itself rather than by another party for payment to Gentner. Logically, one would think that must be so and that Gentner's status as the payee of the cashier's check would preclude it from claiming holder-in-due-course status. (See U. Com. Code com. 4, 23B West's Ann. Cal. U. Com. Code (1999 pocket supp.) § 3302, p. 37 (hereafter UCC com.) ["In the typical case the holder in due course is not the payee of the instrument. Rather, the holder in due course is an immediate or remote transferee of the payee."].) However, as the commentators make clear, under the Commercial Code's definition of "holder in due course," "[t]he payee of an instrument can be a holder in due course" even though "use of the holder-in-due-course doctrine by the payee of an instrument is not the normal situation," and only "in a small percentage of cases" would it be "appropriate to allow the payee of an instrument to assert rights as a holder in due course." (*Ibid.*) As we read the statutory definition, nothing in it precludes a payee from being a holder in due course—if it can somehow meet the requirements of good faith and complete lack of knowledge about any potential defenses held by the drawer or maker of the instrument.[5] Because it is extremely unlikely that the original payee will be able to establish such complete ignorance under normal circumstances, the advantages of holder-in-due-course status will apply to a payee only "in a small percentage of cases . . . ." (*Ibid.*)

The older version of section 3305—the section which lays out the defenses available against holders in due course and others—created confusion

---

[5] As discussed in the comment to section 3302, the provision previously expressly stated: " 'A payee may be a holder in due course.' " (UCC com. 4, *supra*, § 3302, at p. 37.) This has been omitted in the 1992 version as "surplusage." (*Ibid.*)

because it stated that a holder in due course took the instrument free from "[a]ll defenses of any party to the instrument with whom the holder has not dealt . . . ." (Stats. 1963, ch. 819, § 3305, p. 1901.) It is hard to imagine how an original payee, who always in some sense "deals" with the drawee, could ever claim holder-in-due-course status if that provision meant what it said. The comment to revised section 3305, which eliminated the puzzling phrase, concedes that "[t]he meaning of this language was not at all clear and if read literally could have produced the wrong result." (UCC com. 2, *supra*, § 3305, at p. 44.)[6]

The situation of a bank accepting a customer's check and giving the payee a cashier's check in return appears to fall within one of those small percentage of cases which presents an opportunity for the payee to establish holder-in-due-course status. Gentner, the payee of the cashier's check, was acting in complete good faith and had no knowledge of any potential defenses held by Wells Fargo as drawer of the instrument. Specifically it did not know, and had no reason to know, that the L&M check which it submitted to Wells Fargo was subject to a stop notice and was, from Wells Fargo's perspective, worthless since the funds could not be recovered from the customer's account. (See §§ 4401, 4403.)

One of the examples of a payee meeting the requirements to becoming a holder in due course cited in the comment to section 3302, involved a somewhat similar situation. In the example, "Buyer" paid for goods bought from "Seller" by giving Seller a cashier's check issued by Buyer's "Bank." Unbeknownst to Seller, Bank had a defense to paying the cashier's check good against Buyer because there were insufficient funds in Buyer's account to reimburse Bank for the cashier's check. The comment states that "[t]here is no good reason why Seller's position should be any different if Bank drew the check to the order of Seller as payee" as opposed to the situation where Buyer named itself as payee and then transferred it to Seller. In both cases, "Seller can be a holder in due course taking free of the defense [of insufficient funds] if Seller had no notice of the defense." (UCC com. 4, *supra*, case No. 1, § 3302, at p. 37.)

The present case differs from the example given by the commentators because of the existence of an intermediary step. L&M did not directly purchase a cashier's check to pay Gentner for services received. L&M gave Gentner a personal check which Gentner transformed into a cashier's check by presenting it to Wells Fargo for payment. Should this intermediary step prevent Gentner from becoming a holder in due course of the Wells Fargo cashier's check? This is the issue to which we now turn.

---

[6]As we shall see, it apparently did produce the wrong result in a number of cases involving cashier's checks issued in exchange for checks on which payment had been stopped.

## II

The question of who should prevail when a cashier's check was erroneously issued in exchange for a customer's check on which a stop payment order was in effect has bedeviled courts since the earliest days of the Uniform Commercial Code. As the cases cited in the briefs indicate, courts have been divided on the point, each side taking a different analytical approach to justify the result reached. Courts ruling in favor of the banks relied, for the most part, on the payees' inability to take free of the banks' defenses because the payees "dealt with" the banks directly, relying on the discarded phrase in former section 3305. Their approach is illustrated by the Delaware Supreme Court's decision in *Wilmington Trust Company* v. *Delaware Auto Sales* (Del. 1970) 271 A.2d 41. In that case, the bank's customer had purchased a used car with a personal check. The next morning, at 8:35 a.m., dissatisfied with the condition of the car, he called his bank and instructed it to stop payment. Less than an hour later, the payee (the used car seller) went into one of the bank's branches and "exchanged the personal check . . . for a treasurer's check in the same amount." (271 A.2d at p. 41.) Quoting the language of former section 3305 of the Uniform Commercial Code, then in effect, the court concluded that the payee could not assert the rights of a holder in due course because a holder in due course took the instrument free from defenses " 'of any party to the instrument with whom the holder has not dealt . . . .' " (271 A.2d at p. 42, italics omitted.) The court concluded from this that "personal defenses are available between immediate parties." (*Ibid.*) Because the auto seller "dealt directly with [the bank,] even if the auto dealer was a holder in due course, it [wa]s not immune to the defense of want or failure of consideration, as set forth in 5A Del.C. § 3-306(c). [Citations.]" (271 A.2d at p. 42.)

The same conclusion was reached in *Travi Const.* v. *First Bristol Cty. Nat. Bank* (1980) 10 Mass.App. 32 [405 N.E.2d 666], where bank personnel similarly overlooked a stop payment order and replaced its customer's personal check with a cashier's check. The bank argued that it could "refuse to honor its cashier's check for a failure of consideration when it is presented by a party to the instrument with whom the [b]ank has dealt." (405 N.E.2d at p. 667.) Citing the language in former section 3305 of the Uniform Commercial Code, the court agreed with the bank that "even a holder in due course takes an instrument subject to the defenses of any party to the instrument with whom the holder had dealt . . . ." (405 N.E.2d at p. 669.) Accordingly, "[t]he [b]ank had a right to refuse to honor its cashier's check because of a failure of consideration when the check was presented by . . . a party to that instrument with whom the [b]ank had dealt." (*Ibid.*; accord, *Pulaski Chase Co-op.* v. *Kellogg-Citizens Nat.* (1986) 130 Wis.2d 200 [386 N.W.2d 510, 512] [Faced with the same situation, the court held: "[A]n

issuing bank may raise appropriate defenses and refuse to honor its cashier's check held by a party to the instrument with whom the bank has dealt."].)[7]

The holdings in *Wilmington Trust, Travi Const.*, and *Pulaski Chase* did not represent the prevailing view. Most courts took a much more direct approach, illustrated by the Fourth Circuit's one-page opinion in *Swiss Credit Bank* v. *Virginia Nat. Bank-Fairfax* (4th Cir. 1976) 538 F.2d 587, in which the court succinctly stated: "A cashier's check is a bill of exchange drawn by a bank upon itself. It is accepted in advance by the act of its issuance, and it cannot be dishonored by the issuing bank because of an indebtedness to it of one of its customers. [Citations.]" (538 F.2d at p. 588.) The same sentiment was expressed in a more elaborate opinion by the district court in *Kaufman* v. *Chase Manhattan Bank, National Ass'n* (S.D.N.Y. 1973) 370 F.Supp. 276, 278: "A cashier's check . . . is a check drawn by the bank upon itself, payable to another person, and issued by an authorized officer of the bank. The bank, therefore, becomes both the drawer and drawee; and the check becomes a promise by the bank to draw the amount of the check from its own resources and to pay the check upon demand. Thus, the issuance of the cashier's check constitutes an acceptance by the issuing bank; and the cashier's check becomes the primary obligation of the bank. [Citations.] Since a cashier's check is a bank's primary obligation, a cashier's check is presumed to have been issued for value. This presumption cannot be overcome by evidence that the bank did not receive consideration for the cashier's check from the payee. Such proof is irrelevant and provides no defense. [Citations.] Hence, once the cashier's check has been issued and delivered to the payee, the transaction is complete so far as the payee is

---

[7]Contrary to Wells Fargo's assertion, the courts in these cases did not base their decisions on the payee's failure to achieve holder-in-due-course status due to the fact that the bank received no consideration. Each assumed that the payee was a holder in due course, but was precluded from the benefits of that status by former section 3305 and the fact they had "dealt" directly with the bank in purchasing the cashier's check. The court in *International Furn. Dis.* v. *First Ga. Bank* (1982) 163 Ga.App. 765 [294 S.E.2d 732], cited by Wells Fargo in its brief, took a broader stance and concluded that in a dispute between a bank and an original payee, the bank could refuse to pay a cashier's check because an original payee could never be a holder in due course. (*Id.* at p. 733.) *International Furn. Dis.* cited *Wright* v. *Trust Company of Georgia* (1963) 108 Ga.App. 783 [134 S.E.2d 457] for that proposition, a case which predated adoption of the Uniform Commercial Code. (To the same effect is *Tropicana Pools, Inc.* v. *First Nat. Bank of Titusville* (Fla.Dist.Ct.App. 1968) 206 So.2d 48 decided under the Negotiable Instruments Law, the Uniform Commercial Code's predecessor.) As we have discussed, this represents an incorrect understanding of the Commercial Code. *Amos Flight Operations, Inc.* v. *Thunderbird Bank* (1975) 112 Ariz. 263 [540 P.2d 1244], also relied on by Wells Fargo, involved a series of checks drawn on an account which had no funds but which the bank had mistakenly credited with a large deposit. The bank was seeking to recover from its own customer. The case involved neither cashier's checks nor an attempt to recoup payments from a third party and is of little relevance here.

concerned. Any failure of the bank to charge such checks against the account of the depositor or to take other action to protect its own rights and interests will not affect the unconditional right of payment inuring to the payee. [Citations.]" (Fn. omitted.)

The identical conclusion was reached by courts in numerous other situations where the instrument exchanged for the bank's cashier's check proved uncollectible. (See, e.g., *Munson* v. *American National Bank & Trust Co. of Chicago* (7th Cir. 1973) 484 F.2d 620, 623-624 ["By definition a cashier's check is a bill of exchange drawn by a bank upon itself and accepted in advance by the act of issuance. [Citations.] After issuance defendant bank simply had no right to countermand the cashier's checks. [Citations.]"]; *Able & Associates* v. *Orchard Hill Farms, etc.* (1979) 77 Ill.App.3d 375, 381-382 [32 Ill.Dec. 757, 395 N.E.2d 1138, 1142] ["[P]olicy considerations require a rule which prohibits a bank from refusing to honor its cashier's checks."]; *Moon Over The Mountain, Ltd.* v. *Marine Midland Bank* (1976) 87 Misc.2d 918, 920-921 [386 N.Y.S.2d 974, 976] ["Since acceptance is a bank's own engagement to pay [citation], it follows that a cashier's check is accepted in advance by the act of issuance and that the issuing bank remains liable, after a stop payment order, even where there is a failure of consideration in the underlying transaction for which the check was given."]; *Wertz* v. *Richardson Heights Bank and Trust* (Tex. 1973) 495 S.W.2d 572, 574 ["A cashier's check is defined as a bill of exchange drawn by a bank upon itself and accepted in advance by the act of its issuance and not subject to countermand by either its purchaser or the issuing bank."]; *National Newark & Essex Bank* v. *Giordano* (1970) 111 N.J.Super. 347, 351 [268 A.2d 327, 329] ["The rule may thus be stated that a cashier's check is accepted for payment when issued. [Citations.]"].)

We perceive problems with both approaches to the issue. The analysis of the courts in cases such as *Wilmington Trust*, *Travi Const.*, and *Pulaski Chase* does not hold up due to the rewriting of section 3305, deleting the reference to holders in due course taking an instrument free from the defenses "of any party to the instrument with whom the holder has not dealt . . . ." As we have discussed, the comments to the revised Commercial Code make clear that even an original payee who deals directly with the drawer of the check can meet the statutory requirements and be considered a holder in due course under the appropriate circumstances.

But the analysis which depends on a cashier's check being deemed "accepted for payment when issued" also has drawbacks. First, that language appears nowhere in the Commercial Code. (See *Santos* v. *First Nat'l State Bk. of N. J.* (1982) 186 N.J.Super. 52 [451 A.2d 401, 405] ["Although the

common belief is that cashier's checks are cash equivalents, the provisions of the Uniform Commercial Code give no indication of how cashier's checks are to be treated. The Code's failure to set forth the rights and liabilities of the parties to a cashier's check has created a good deal of confusion."].) Some courts purported to find justification for the rule in sections 3409 and 3410 which have to do with a bank's "acceptance" of a customer's check by "a writing on the check which indicates that the check is certified." (§ 3409, subd. (d).) Because the writing needed to constitute acceptance or certification "may consist of the drawee's signature alone" (*id.*, subd. (a)), some courts said that the fact that cashier's checks contain a bank representative's authorized signature, means that cashier's checks fall under this provision. (*Kaufman* v. *Chase Manhattan Bank, National Ass'n, supra*, 370 F.Supp. at p. 278, fn. 5; *National Newark & Essex Bank* v. *Giordano, supra*, 268 A.2d at p. 329.) The court in *Moon Over The Mountain, Ltd.* v. *Marine Midland Bank* admitted that "the UCC does not indicate when a cashier's check is deemed accepted . . . ." (386 N.Y.S.2d at p. 976.) Nevertheless, it found justification for its holding in (former) section 3802 (now section 3310) which, in the court's words, "provides for the discharge of the underlying obligation whenever a bank is 'drawer, maker or acceptor' of the instrument given in payment." (386 N.Y.S.2d at p. 976.) Since under that provision "the payee loses its right against the purchaser when it accepts the bank instrument in payment of the underlying debt, the bank cannot be free to refuse payment." (*Ibid.*)

Second, the "accepted when issued" analysis does not seem to leave room for a bank's refusal to pay even when confronted by a holder who knew of the bank's defenses or was actively involved in a plot to defraud the bank or its customer, such as where the cashier's check is obtained with an unauthorized check or after the payee received notice of the stop payment order. This was discussed in *TPO Incorporated* v. *Federal Deposit Insurance Corp.* (3d Cir. 1973) 487 F.2d 131 where the court refused to follow *National Newark & Essex Bank* v. *Giordano, supra*, 268 A.2d 327, because the payee of a series of cashier's checks may have been involved in a fraudulent scheme to convert a company's assets into its president's personal portfolio, and may not have actually given value because it could not prove that it transferred the securities for which the checks were paid. The court in *TPO* concluded that ". . . a cashier's check is equivalent to a negotiable promissory note of a bank, it is not the same as cash as has been loosely asserted . . . ." (*TPO Incorporated* v. *Federal Deposit Insurance Corp., supra*, 487 F.2d at p. 136.) According to the court, ". . . a correct analysis of the position of the parties here is that the Bank had engaged to pay the check but, if the plaintiff is not a holder in due course, . . . the Bank . . . is entitled to present all defenses which would be available on a simple contract including one of lack of consideration or fraud." (*Ibid.*, fn. omitted.)

*TPO* was followed in *Banco Ganadero y Agricola, Etc.* v. *Soc. Nat. Bk., Cleve.* (N.D.Ohio 1976) 418 F.Supp. 520, where the court concluded: "[A] cashier's check drawn by a bank on itself is more accurately treated as a note than as an 'accepted' check. So concluding, it is pertinent to invoke the U.C.C. rule that as against one who is not a holder in due course, the maker of a note may assert the defense of failure of consideration. [Citations.]" (*Id.* at p. 524; see *Santos* v. *First Nat'l State Bk. of N. J., supra*, 451 A.2d at p. 410, fn. 22 [discussing these cases in the context of a cashier's check lost in the mail, and noting that "[o]ne solution" to the problem of what to do when dealing with issues involving disputes over payment of cashier's checks "is to treat cashier's checks as notes for some purposes and as other instruments, such as checks, for other purposes."].)

We agree that a rule which permits only a person acting in good faith and who has given value to recover in these types of situations makes more sense than a blanket rule that a cashier's check can never be refused because it is accepted when issued. Fortunately, the 1992 revisions to the Commercial Code allow us to resolve the issue before us without resort to a blanket rule or a rule under which the nature of a cashier's check fluctuates from case to case.[8]

Section 3418, subdivision (a) now expressly covers mistaken payments of this kind and provides that ". . . if the drawee of a draft pays or accepts the draft and the drawee acted on the mistaken belief that (1) payment of the draft had not been stopped pursuant to Section 4403 or (2) the signature of the drawer of the draft was authorized, the drawee may recover the amount

---

[8]Wells Fargo suggests that this issue has already been resolved. In *Tokai Bank of California* v. *First Pacific Bank* (1986) 186 Cal.App.3d 1664, 1667 [231 Cal.Rptr. 503], the court, relying on a 1914 California Supreme Court decision, held that "bank could defend against paying a cashier's check where the bank issued the check under a mistake of fact and the holder did not change position in reliance on the negotiability of the check" because execution and delivery of a cashier's check does not cause the bank's liability to " 'bec[ome] absolute.' " (186 Cal.App.3d at p. 1667.) Having said that, the court went on to hold that the bank in which two cashier's checks had been deposited was a holder in due course where it gave its customer credit for the checks and used the credit to satisfy a preexisting debt owed by the customer to the bank because " 'A holder takes the instrument for value . . . (b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due . . . .' " (*Id.* at p. 1669, quoting *Bank of Costa Mesa* v. *Losack* (1977) 74 Cal.App.3d 287, 293-294 [141 Cal.Rptr. 550]; see § 3303, subd. (a)(3).) We are not clear that this decision helps Wells Fargo's cause. Gentner did, in a very real sense, take the cashier's check in payment of L&M's antecedent debt, which, under the *Tokai* court's analysis, constitutes value. In any event, because the case was decided prior to the 1992 revisions to the Commercial Code, we do not believe it is dispositive. In a more recent decision, a bankruptcy court expressed the belief that "a cashier's check is accepted upon issuance" in California. (*In re Lee* (Bankr. 9th Cir. 1995) 179 B.R. 149, 158.) The court cited sections 3409 to 3413, essentially the same provisions relied on by the courts in *Kaufman* v. *Chase Manhattan Bank, National Ass'n, supra,* 370 F.Supp. 276, and *National Newark & Essex Bank* v. *Giordano, supra,* 268 A.2d 327.

of the draft from the person to whom or for whose benefit payment was made or, in the case of acceptance, may revoke the acceptance." Subdivision (b) provides that recovery of mistaken payments may be had under "the law governing mistake and restitution . . . ." But the right to recover which subdivisions (a) and (b) give to the drawee bank, subdivision (c) takes away for certain kinds of holders: "The remedies provided by subdivision (a) or (b) may not be asserted against a person *who took the instrument in good faith and for value* or who in good faith changed position in reliance on the payment or acceptance." (Italics added.)

This represents a substantive change in the law. Former section 3418 provided that "payment or acceptance of any instrument [including mistaken payment] is final in favor of *a holder in due course,* or *a person who has in good faith changed his position in reliance on the payment.*" (Stats. 1963, ch. 819, § 3418, p. 1907, italics added.) In other words, under the former provision, a party in Gentner's place had the burden of proving either that it was a holder in due course of the underlying instrument or both good faith and reliance. Under the current law, the provisions of section 3418 precluding the bank from recovering its mistaken payment, come into effect as long as the payee took the instrument in good faith and for value—an easier burden to meet.

As the comment to section 3418 makes clear, this provision means a bank which erroneously pays a customer's check subject to a stop payment order to a payee who had taken *the customer's check* in good faith and for value must forego any hope of recovery of the funds from the payee: "Subsection (a) allows restitution in the two most common cases in which the problem [of mistaken payment] is present: payment or acceptance of forged checks and checks on which the drawer has stopped payment. . . . [I]n each case, by virtue of subsection (c), the drawee loses the remedy [of restitution] if the person receiving payment or acceptance was a person who took the check in good faith and for value or who in good faith changed position in reliance on the payment or acceptance. . . . *The result in the two cases covered by subsection (a) is that the drawee in most cases will not have a remedy against the person paid because there is usually a person who took the check in good faith and for value or who in good faith changed position in reliance on the payment or acceptance.*" (UCC com. 1, *supra,* § 3418, at p. 85, italics added.)

The 1992 amendments to the Commercial Code have thus firmly placed on banks the onus of finding a way of effectively communicating the existence of stop notice orders to the persons responsible for making decisions about the validity of checks. Comment 1 to section 4403 expressly

states: "The position taken by this section is that stopping payment or closing an account is a service which depositors expect and are entitled to receive from banks notwithstanding its difficulty, inconvenience, and expense. The inevitable occasional losses through failure to stop or close should be borne by the banks as a cost of the business of banking." (UCC com. 1, *supra*, § 4403, at p. 161.)

When Gentner presented the check for payment to Wells Fargo, in good faith, on October 15, 1996, Wells Fargo had its opportunity under the Commercial Code to refuse to honor the check. Instead, it "pa[id] or accept[ed] the draft . . . on the mistaken belief that . . . payment of the draft had not been stopped pursuant to Section 4403 . . . ." (§ 3418, subd. (a).) This brought section 3418 into play, and precluded Wells Fargo from recovering the payment from Gentner although it was made by mistake, contrary to its customer's order.[9]

The fact that Wells Fargo used a cashier's check to pay the L&M check rather than cash makes no difference under section 3418 as is clear from the comment's discussion of the alternate ways of mistakenly paying a check:

---

[9]Wells Fargo contends that this matter must be remanded for further factual findings because neither party brought section 3418 to the attention of the trial court and, as a result, it did not make any specific factual findings with regard to its requirement that the underlying check had been obtained in good faith and for value or that payment resulted in reliance. As Wells Fargo acknowledges in its opening brief, the record establishes that L&M "engaged [Gentner] to provide certain business consulting services" and that "L&M paid Gentner for those services with a company check in the amount of $60,000.00." In excerpts from the deposition of Rocky Gentner, placed into evidence below, Mr. Gentner described the extensive services performed for L&M and further stated that L&M had never to his knowledge disputed the value of the services or the amount owed. He further testified that the reason he personally presented the check to Wells Fargo for payment was that L&M "was asking us to do continued work on some Medicare audits and appeals that were going on, and I wanted to know before we moved in those directions whether or not this check was still valid." No evidence was presented to contradict this testimony. At the hearing, the trial court asked Wells Fargo's counsel: "Is there any evidence that Gentner knew about or tried to take advantage of the mistakes made by Wells Fargo Bank?" Counsel conceded that "At the time Gentner tried to negotiate the cashier's check, . . . there is no evidence of that, that I am aware of." After hearing argument, the court stated: "[T]he question boils down to this: As between Gentner and Wells Fargo, who should stand good for the Wells Fargo mistake, certainly, when there was no wrongdoing on the part of Gentner." Counsel for Wells Fargo did not take issue with the statement that Gentner committed no wrongdoing. It is clear from the record that Wells Fargo did not dispute that Gentner gave value for the L&M check or that it negotiated both the L&M check and the cashier's check in good faith. Here and before the trial court, the only issue raised by Wells Fargo was whether Gentner failed the holder-in-due-course test because it had not given value for the cashier's check, and was therefore subject to the defenses of failure of consideration and mistake. Wells Fargo had ample opportunity to contest Gentner's good faith and the value given for the underlying check at trial. It is not entitled to a second chance merely because it pinned its whole case on an incorrect understanding of the law.

"The drawee bank normally pays a check by a credit to an account of the collecting bank that presents the check for payment. The payee of the check normally receives the payment by a credit to the payee's account in the depositary bank. But in some cases the payee of the check may have received payment directly from the drawee bank by presenting the check for payment over the counter. In those cases the payee is entitled to receive cash, but the payee may prefer another form of payment such as a cashier's check or teller's check issued by the drawee bank." (UCC com. 2, *supra*, § 3418, at p. 85.) Giving an example of "Buyer" who pays for goods to be delivered by "Seller" with a personal check and then stops payment on the check, the comment states that if Seller presents the check to Buyer's Bank for payment over the counter and requests a cashier's check as payment, ". . . Buyer's check was paid by Bank at the time it delivered its cashier's check to Seller. [Citation.] *Bank is obliged to pay the cashier's check and has no defense to that obligation. The cashier's check was issued for consideration because it was issued in payment of Buyer's check*." (*Ibid.*, italics added.)

We could, as the comments suggest, simply conclude that Gentner gave consideration for the cashier's check because it was issued in payment of the L&M check. (See § 3303, subd. (a)(4) ["An instrument is issued or transferred for value if . . . [¶] . . . [¶] [t]he instrument is issued or transferred in exchange for a negotiable instrument."].) Or we can reach the same result by undertaking a more comprehensive analysis: Gentner had given value for the $60,000 L&M check and was acting in good faith when it presented the check to Wells Fargo; Wells Fargo's actions on October 15, 1996—whether characterized as payment or acceptance of the L&M check—gave Gentner an irrevocable right to $60,000 under section 3418; Gentner exchanged the right to $60,000 for a Wells Fargo cashier's check. It follows under either analysis that Gentner gave value for the cashier's check as that term is defined by the Commercial Code and is entitled to holder-in-due-course status.

We are aware that comment 2 to section 3305 states in the context of a simple buyer/seller transaction: "If Buyer issues an instrument to Seller and Buyer has a defense against Seller, that defense can obviously be asserted. Buyer and Seller are the only people involved. The holder-in-due-course doctrine has no relevance. *The doctrine applies only to cases in which more than two parties are involved.* Its essence is that the holder in due course does not have to suffer the consequences of a defense of the obligor on the instrument that arose from an occurrence with a third party." (UCC com. 2, *supra*, § 3305, at p. 44, italics added.) We do not believe our conclusion conflicts with the italicized statement. As explained in the comments, the typical situation in which a payee can claim holder-in-due-course status

occurs when a bank issues a negotiable instrument to pay for goods or services supplied by the payee to the bank's customer at the request of its customer. (See UCC com. 4, case No. 1, *supra*, § 3302, at p. 37; *id.*, com. 2, § 3305, at p. 44.) That is what happened here, although, as we have seen, the present case involved the additional step of the "buyer" (L&M) issuing a check to the "seller" (Gentner) which was exchanged for a cashier's check from the "buyer's" bank. The presence of that additional step did not change the essential nature of the transaction. The purpose behind Gentner's visit to Wells Fargo on October 15, 1996, was to obtain payment for work it had performed for L&M. It chose Wells Fargo not because of its own relationship to the bank[10] or because it wanted to buy a cashier's check for some independent reason of its own, but because Wells Fargo was the drawee of the L&M check. Wells Fargo never expected to receive any consideration *from Gentner*. It issued the cashier's check in payment of the L&M check because of its mistaken belief that it would be reimbursed from the funds in L&M's account (§ 4401 [bank may charge against the account of a customer an item that is properly payable from that account]), and that it was required to do so by its agreement with L&M (see § 4402 [bank liable for damages suffered by customer due to wrongful dishonor of customer's check]). As the trial court stated: "This is a three-party transaction. . . . [T]here's a third party involved, and it's L&M."

This result may seem harsh,[11] but it is in line with the Commercial Code's purpose of "promulgating the integrity, certainty, and finality of commercial transactions." (*Chicago Title Ins. Co.* v. *California Canadian Bank* (1991) 1 Cal.App.4th 798, 811 [2 Cal.Rptr.2d 422].) When a payee presents a check

---

[10]Gentner was also a Wells Fargo customer.

[11]The Commercial Code does not leave banks who find themselves in this situation without a remedy. Section 4407 provides that a bank which "paid an item over the order of the drawer or maker to stop payment," is subrogated to the rights "(a) Of any holder in due course on the item against the drawer or maker. [¶] (b) Of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose. [¶] (c) Of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose." In other words, if L&M had a valid dispute with Gentner over Gentner's right to payment, Wells Fargo could have raised that in the lawsuit as L&M's subrogee. Alternatively, if, as the record before us indicates, L&M had no defense against Gentner's claim, Wells Fargo could have attempted to obtain reimbursement from its customer as Gentner's subrogee.

While the code permits Wells Fargo to proceed against L&M by virtue of section 4407, it puts an obstacle in Gentner's path. Section 3310, subdivision (a) provides: "Unless otherwise agreed, if a certified check, cashier's check, or teller's check is taken for an obligation, the obligation is discharged to the same extent discharge would result if an amount of money equal to the amount of the instrument were taken in payment of the obligation." This would appear to mean that by taking the cashier's check Gentner can no longer look to L&M for payment of the $60,000 due, and that, by accepting the L&M check and issuing the cashier's check in its place, Wells Fargo placed Gentner in a worse position.

to the drawee bank, it is entitled to a prompt and accurate answer to the question "Is this check good?" so that it may plan its financial affairs accordingly. The current state of technology permits bank employees to have the necessary information at their fingertips. Quoting the Minnesota Supreme Court, this court said in *Los Angeles National Bank* v. *Bank of Canton* (1995) 31 Cal.App.4th 726, 744 [37 Cal.Rptr.2d 389]: " 'The present banking system under which an enormous number of checks are processed daily could not function effectively if banks were not required to make prompt and effective decisions on whether to pay or dishonor checks. [Citations.]' " (*Ibid.*, quoting *Town & Country State Bank* v. *First State Bank* (Minn. 1984) 358 N.W.2d 387, 395; see § 4302 [requiring bank to give notice of dishonor or refusal to pay a check by midnight of the day following receipt of the check from depositary bank or intermediary bank or suffer the consequence of becoming obligated to pay the check].) Because of Wells Fargo's error, Gentner did not know for three months of L&M's attempt to dishonor its debt and was lulled into inaction during a crucial period when it needed to move quickly to protect its interests vis-à-vis L&M's other creditors. As between these two innocent parties, Wells Fargo was better able to protect itself by acting while there was still money in L&M's account. It is appropriate that Wells Fargo suffer the loss.

DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Epstein, J., concurred.