FLATIRON LINEN, INC., Petitioner,

v.

FIRST AMERICAN STATE BANK, a Colorado state banking corporation, and Colorado National Bank, a bank corporation, Respondents.

No. 99SC887.

Supreme Court of Colorado, En Banc.

May 29, 2001.

**1210**

Levi Martinez, Vice President, Flatiron Linen, Inc., Denver, CO, Pro Se.

Aronowitz & Ford, LLP, Timothy C. Ford, Denver, CO, Attorneys for Respondents.

Justice KOURLIS delivered the Opinion of the Court.

In this case, we granted certiorari to address questions related to the legal status of a cashier's check under Articles 3 and 4 of the Uniform Commercial Code (U.C.C.). Specifically, we address the issue of whether an obligated bank that accepts an endorsed personal check on the account of one of its customers and issues a cashier's check in the same amount can later refuse to honor that cashier's check on the basis that its customer had previously placed a stop payment order on the check and its employee, the cashier, failed to notice the stop payment order on the computer records. In the case before us, the trial court granted summary judgment for First American State Bank (First American) concluding that the existence of the stop payment order precluded Flatiron Linen, Inc. (Flatiron) from negotiating the personal check and receiving the cashier's check "for value" and thus Flatiron had no recourse against First American for refusing to honor the cashier's check. The court of appeals agreed with the trial court. *Flatiron Linen, Inc. v. First Am. State Bank,* 1 P.3d 244, 246 (Colo.App.1999).

We disagree, and determine that a cashier's check is equivalent to cash. Hence, once issued, First American may not dishonor the cashier's check. Additionally, First American has no remedy against Flatiron for mistakenly paying the personal check despite the stop payment order because Flatiron took the cashier's check in good faith and for value under the terms of section 4-3-418(c), 2 C.R.S. (2000).

Accordingly, we reverse the court of appeals and remand the case with directions to return it to the trial court for proceedings consistent with this opinion.

## I.

In 1996, Flatiron received a personal check for $4,100, drawn on an account at First American.[1] Flatiron attempted to deposit the check the same day, but First American returned the check to Flatiron due to insufficient funds in the issuer's account. The next day, the issuer of the check contacted First American and requested a stop payment order on the dishonored check.

Five months later, without knowledge of the stop payment order, Flatiron contacted First American and inquired whether the dishonored check would clear. An employee of First American responded that the ac-

---

1. The plaintiff named the check's issuer, Fluffy Reed Foundation, Inc., and one of its officers, Bilgen Reed, as defendants in the action, but was never able to serve them. The check represents a partial refund of fees that the Foundation and Bilgen Reed allegedly fraudulently procured from Flatiron to secure a promised $2,000,000 business loan.

count contained sufficient funds for the check to clear. Flatiron then took the check to a First American branch and presented it for payment. A teller again verified that the account had sufficient funds to cover the check. The teller failed to notice the stop payment order on the check and, in exchange for the check, issued the plaintiff a cashier's check for $4,100.

Flatiron then went to its own bank, Colorado National Bank (CNB), deposited the cashier's check, and immediately withdrew the same amount of funds in the form of cash and a CNB cashier's check payable to Public Service Company of Colorado. Meanwhile, First American discovered the stop payment order on the original check. First American called and wrote to Flatiron, informing Flatiron of First American's mistake in issuing the cashier's check, asking for its return, and informing Flatiron that it intended to dishonor the cashier's check upon presentment.

The next day, CNB contacted Flatiron and informed it that First American had indeed dishonored the cashier's check. CNB charged back Flatiron's account for the amount of the cashier's check, resulting in an overdraft in Flatiron's account.

Flatiron filed this action, alleging fraudulent misrepresentation and negligence against the issuer of the original check and one of its officers. Flatiron also sued First American to recover on First American cashier's check, and sued CNB alleging that it wrongfully charged back Flatiron's account instead of asserting rights for itself as a holder in due course of the check.

The trial court dismissed the complaint against CNB, ruling that under U.C.C. Article 4, sections 4–4–201 and 4–4–214, 2 C.R.S. (2000), CNB did not qualify as an owner of the check but instead served as Flatiron's agent in a provisional settlement, and remained entitled to charge back Flatiron's account when First American dishonored the check. On cross motions for summary judgment, the court also granted summary judgment for First American, ruling that Flatiron did not have holder in due course status because the original check had no value due to the stop payment order. The trial court also ruled that "even if Flatiron was a holder

in due course, [First American] is still entitled to assert the affirmative defense of failure of consideration against Flatiron because it dealt directly with the Bank and no intermediaries or remitters were involved."

On appeal, the court of appeals agreed that Flatiron was not a holder in due course because it did not take the check "for value" under section 4–3–302(a)(2), 2 C.R.S (2000), and because Flatiron was a payee who dealt directly with the bank. *Flatiron Linen*, 1 P.3d at 249. The court of appeals therefore held that First American could assert the defense of failure of consideration against Flatiron under section 4–3–305, 2 C.R.S. (2000), which allows simple contract defenses against a holder not in due course. *Id.*

## II.

We begin by discussing the proper classification of cashier's checks. Our analysis of this case turns on whether we treat a cashier's check as an ordinary negotiable instrument or whether we treat it as equivalent to cash.

## A.

Courts are split on this issue. A minority of courts treat a cashier's check as a note, subject to the provisions of the U.C.C. *Farmers & Merchants State Bank v. Western Bank*, 841 F.2d 1433, 1440 (9th Cir.1987) (applying Oregon law and stating that "nothing in the U.C.C. suggests that cashier's checks should be treated differently from other instruments subject to Articles 3 and 4"); *Gentner & Co., Inc. v. Wells Fargo Bank*, 76 Cal.App.4th 1165, 90 Cal.Rptr.2d 904, 911 (1999); *Am. Fed. Sav. & Loan Ass'n v. Madison Valley Props., Inc.*, 288 Mont. 365, 958 P.2d 57, 61 (1998).

Both the trial court and the court of appeals adopted this approach. Under this reasoning, courts then turn to the U.C.C. to determine which defenses the bank may assert against the holder of a cashier's check. Section 4–3–305 outlines the availability of defenses to the payment of negotiable instruments under the revised U.C.C. and differentiates between defenses that may be asserted

only against a holder in due course and those that may be asserted against a holder not in due course. The only defenses available against a holder in due course are the "real defenses." When the instrument is held by a holder not in due course, the obligor can raise not only the real defenses, but also the general contract defenses and the defenses included in the U.C.C.[2] Failure of consideration is a defense that "would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract." § 4–3–305(a)(2). Therefore, such a defense cannot be used against a holder in due course. § 4–3–305(b). Section 4–3–302 outlines the requirements to establish the status of a holder in due course. The basic prerequisites of a holder in due course are: receiving the instrument for value, in good faith, and without notice of defects or claims against it.[3] § 4–3–302. Hence, under this theory, in order for Flatiron to have holder in due course status, it must prove that it acted in good faith when it presented the personal check, that it had no knowledge of the stop payment order, and that the personal check had intrinsic value.

■ The majority of courts hold that a cashier's check is the equivalent of cash, accepted when issued. Those courts do not treat the cashier's check as a check on the bank's account, but rather as the equivalent of cash. *Hotel Riviera, Inc. v. First Nat'l Bank & Trust*, 768 F.2d 1201, 1203 (10th Cir.1985) (applying Oklahoma law); *Comput-*

*er Works, Inc. v. CNA Ins. Co.*, 757 P.2d 167, 168 (Colo.App.1988). Courts following this approach have held that a cashier's check is a bill of exchange drawn by a bank upon itself. *Swiss Credit Bank v. Virginia Nat'l Bank–Fairfax*, 538 F.2d 587, 588 (4th Cir.1976) (applying Virginia law). Therefore, it is "accepted in advance by the act of its issuance, and it cannot be dishonored by the issuing bank." *Id.*

We agree with the majority of courts that a cashier's check is equivalent to cash.

### B.

■ We begin with an analysis of the U.C.C.'s treatment of cashier's checks. Although the U.C.C. does not specifically state how cashier's checks should be classified, it does provide some guidance. Section 4–3–104(g), 2 C.R.S. (2000), defines a cashier's check as "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank." Because the bank serves as both the drawer and the drawee of the cashier's check, the check becomes a promise by the bank to draw the amount of the check from its own resources and to pay the check upon demand. *Kaufman v. Chase Manhattan Bank, Nat'l Ass'n*, 370 F.Supp. 276, 278 (S.D.N.Y.1973). Thus, the issuance of the cashier's check constitutes an acceptance by the issuing bank and the cashier's check itself becomes the primary obligation of the bank. *United States v. Stickell*, 234 F.Supp. 400, 403 (D.Colo.

---

**2.** § 4–3–305. **Defenses and claims in recoupment.**

  (a) Except as stated in subsection (b) of this section, the right to enforce the obligation of a party to pay an instrument is subject to the following:

    (1) A defense of the obligor based on (i) infancy of the obligor ..., (ii) duress, lack of legal capacity, or illegality of the transaction ..., (iii) fraud that induced the obligor to sign the instrument ..., or (iv) discharge of the obligor in insolvency proceedings.

  (b) The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1) of this section, but is not subject to defenses of the obligor stated in subsection (a)(2) of this section ... against a person other than the holder.

**3.** § 4–3–302. **Holder in due course.**

  (a) "holder in due course" means the holder of an instrument if:

    (1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

    (2) The holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in section 4–3–306, and (vi) without notice that any party has a defense or claim in recoupment described in section 4–3–305(a).

1964). Once the bank issues and delivers the cashier's check to the payee, the transaction is complete as far as the payee is concerned. *Kaufman*, 370 F.Supp. at 278. Because the issuing bank is obligated to pay the cashier's check upon presentment, we conclude that a cashier's check is essentially the same as cash.

Additionally, when read together, sections 4–3–418 and 4–4–215, 2 C.R.S. (2000), and their comments treat cashier's checks as the equivalent of cash. Section 4–3–418 discusses when a bank has paid or accepted a draft by mistake. Comment 2 addresses a situation where a payee receives payment directly from the drawee bank and elects to receive the payment in the form of a cashier's check instead of cash. § 4–3–418, cmt. 2. "Under Section 4–215, [payee's] check was paid by [the drawee bank] at the time it delivered the cashier's check. See Comment 3 to Section [4–4–215]. [The b]ank is obligated to pay the cashier's check and has no defense to that obligation." *Id.* Section 4–4–215(a)(1) and Comment 3 to that section both state that a bank's payment of an item in cash constitutes final payment. When read together, sections 4–3–418 and 4–4–215 and their comments treat a cashier's check as the equivalent of cash and preclude issuing banks from dishonoring them at any time.

### C.

In addition to the statutory preclusion of dishonoring a cashier's check, we look to and take guidance from the nature and usage of cashier's checks. The commercial world treats cashier's checks as the equivalent of cash. People accept cashier's checks as a substitute for cash because the bank, not an individual, stands behind it. By issuing a cashier's check, the bank becomes a guarantor of the value of the check and pledges its resources to the payment of the amount represented upon presentation. "To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful." *Nat'l Newark & Essex Bank v. Giordano*, 111 N.J.Super. 347, 268 A.2d 327, 329 (1970).

As one commentator observes, "Cashier's checks play a unique role in the American economy because they are widely recognized as a cash equivalent. The public uses cashier's checks because they are a reliable vehicle for transferring funds, are as negotiable as cash, and are free of the risks of loss and theft that accompany cash." Shari Barron, Comment, *Bossuyt v. Osage Farmers National Bank: Cashier's Checks Under the Iowa Uniform Commercial Code*, 73 Iowa L. Rev. 521, 521 (1988).

In short, we conclude that cashier's checks represent the unconditional obligation of the issuing bank to pay, and therefore, banks may not dishonor their cashier's checks once issued.

### III.

Although First American may not dishonor its cashier's check, the remaining issue is whether it may proceed against the entity obtaining the cashier's check, Flatiron, for reimbursement.

Section 4–3–418(a), states that "if the drawee of a draft pays or accepts the draft and the drawee acted on the mistaken belief that (i) payment of the draft had not been stopped ..., the drawee may recover the amount of the draft from the person to whom ... payment was made." However, a drawee may not recover payment against a person who took the instrument in good faith and for value. § 4–3–418(c). This section allows a bank to recover from individuals who fraudulently procure payment from a bank. The remedy remains the same whether the individual receives the payment by a credit to his or her account, cash or a cashier's check.[4]

Hence, in order to determine whether First American is entitled to reimbursement from Flatiron, we must decide whether Flatiron either took the personal check in good

---

**4.** "If a check has been paid by mistake and the payee receiving payment did not give value for the check ... the drawee bank is entitled to recover the amount of the check under subsection (a) regardless of how the check was paid." § 4–3–418, cmt. 2.

faith and for value, or changed its position in reliance upon receipt of the payment.

The trial court held, and the court of appeals agreed, that Flatiron did not take the cashier's check for value, because at the time it exchanged the personal check, that personal check was subject to a stop payment order and was without value. We disagree with that analysis. Flatiron indisputably took the personal check from Fluffy Reed for value, as a refund for a loan commission. Any dispute between those parties would be the subject of a different cause of action completely. We read the U.C.C. to refer, in its use of "value," to an objective analysis of the underlying transaction. For example, the Comment to section 4–3–418 concludes that if the recipient of a check had not delivered goods associated with payment and the bank mistakenly paid the check despite a stop payment order, then the recipient did not take the check for value. § 4–3–418, cmt. 2. Here, Flatiron took the check for value.

We read "good faith" to relate to the state of mind of the individual seeking payment on the check. Accordingly, we hold that Flatiron acted in good faith, because of its lack of knowledge of the stop payment order. Not only did Flatiron have no knowledge of the stop payment order, it went so far as to make sure the account had sufficient funds to cover the check. Therefore, under section 4–3–418, First American had no remedies against Flatiron.[5]

### IV.

In conclusion, we hold that when First American issued the cashier's check, it became an unconditional promise to pay the amount of the check—as the equivalent of cash. Accordingly, First American was not entitled to stop payment on the cashier's check. Further, because Flatiron took the personal check for value and in good faith, section 4–3–418(c) prevents First American from recovering from Flatiron for its mistak-

en payment of the personal check. Therefore, we reverse the judgment of the court of appeals, and remand the case with directions to return it to the trial court for proceedings consistent with this opinion.

Justice BENDER does not participate.

---

5. Even if Flatiron did not take the personal check for value and in good faith, First American would not be entitled to reimbursement because Flatiron changed position in reliance on the acceptance of the funds. After receiving the cashier's check, Flatiron used the funds to make a

payment to Public Service Company of Colorado. This payment constitutes a sufficient change in position to protect Flatiron from First American's remedies under section 4–3–418(a).